IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 15, 2020

**IN RE AVA M., ET AL.**

**Appeal from the Circuit Court for Hamblen County**
**No. 18AD005     Thomas J. Wright, Judge**

_____

**No. E2019-01675-COA-R3-PT**

_____

This appeal concerns the termination of a mother's parental rights. Janae M. ("Mother") is the mother of Ava M., Camille W., and Michael W., III ("the Children").[1] Tommy G. ("Grandfather") and Glenda G. ("Grandmother") ("Grandparents," collectively) are the Children's paternal grandparents. When Mother was incarcerated in 2014, Grandparents received custody of the Children. A few years later, Grandparents filed a petition in the Circuit Court for Hamblen County ("the Trial Court") seeking to terminate Mother's parental rights. After a trial, the Trial Court found that the grounds of failure to support and failure to manifest an ability and willingness to assume custody were proven against Mother, and that termination of Mother's parental rights is in the Children's best interest. Mother appeals arguing, among other things, that the Trial Court wrongly applied two different four-month periods for the ground of failure to support. Grandparents raise their own separate issue of whether the Trial Court erred in not finding the additional ground of failure to visit. We hold, _inter alia_, that although the Trial Court erred in applying two different four-month determinative periods for failure to support, the error was harmless in this case. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

David S. Byrd, Morristown, Tennessee, for the appellant, Janae M.

Crystal G. Jessee, Greeneville, Tennessee, for the appellees, Tommy G. and Glenda G.

---

[1] Ava M. was born in February of 2010; Camille W. in July 2011; and Michael W., III in January 2013.

# OPINION

## Background

Mother and Michael W., Jr. ("Father") are the Children's parents.[2] Grandmother is Father's mother; Grandfather is Father's stepfather. Mother has an extensive history of incurring criminal charges dating back to 2010, including offenses such as theft and assault. Mother, Father, and the Children once lived in the upstairs part of Grandparents' home.

In March 2014, Mother and Father were arrested on drug-related charges. By agreed order of the Juvenile Court for Hamblen County, the Children entered Grandparents' custody. The Children's visitation with Mother was to be supervised. No child support order was entered regarding Mother, but the custody order warned her that failure to support could result in termination of her parental rights.

In May 2018, Mother filed a pro se petition in juvenile court seeking unsupervised visitation with the Children. On July 20, 2018, Grandparents filed a petition in the Trial Court seeking to terminate Mother's parental rights to the Children. Grandparents alleged six grounds: failure to visit, failure to support, wanton disregard, failure to provide a suitable home, persistent conditions, and failure to manifest an ability and willingness to assume custody. On May 8, 2019, Grandparents filed an amended petition in which they reasserted the same six grounds contained in the original petition, but added additional factual allegations arising after the original petition was filed. The case was tried in July 2019.

Grandmother testified that Mother never paid any child support whatsoever for the Children. Grandmother stated that Mother did, however, buy the Children a pizza on a May 5, 2018 visit at a park. Grandmother testified also to an April 8, 2018 visit at the mall where Mother bought the Children a drink out of a machine. At other times, Mother threw the Children birthday parties, and bought Camille some tennis shoes.

Grandmother stated that in December 2015, Mother visited the Children at Grandparents' home but failed to mention that she was about to go to jail. According to Grandmother, Mother was kicked out of drug court. Mother sent Grandmother a letter stating, essentially, that she could not abide by the requirements of drug court. For her part, Grandmother sent Mother a letter laying down certain ground rules for Mother's future visits with the Children. Grandmother was motivated to write this letter because

---

[2] Father consented to termination of his parental rights. This appeal concerns Mother's parental rights only.

she learned that the Children's maternal grandmother had one of them urinate in a bag for her. Grandmother testified to Mother's visitation patterns:

Q. Okay. What would happen when she's in jail versus out of jail with the children?
A. Ava didn't have to -- when she was doing (inaudible), Ava discontinued therapy.
Q. Okay.
A. Her grades would come up. She wouldn't struggle in school. Camille wouldn't have her tantrums as much. When visits happened, they argue on the way home. When we get home, they both start crying. Camille or Ava one will start screaming, "I don't want to leave my home. This is the only home I've ever known."
Q. And let me ask you. You heard opposing counsel, mother's attorney, say that the mother would visit the children once a month or once every other month.
A. Yes.
Q. Was that -- since 2014 is that pretty accurate except for when she was in jail? When she was out of jail, she may visit once a month or every other month?
A. Yeah. There might have been a couple of months where it's going to -- like once or -- you know, a couple times a month.
Q. Uh-huh.
A. But usually it's once a month, once every other.

Continuing her testimony, Grandmother stated that the Children called her niece "mom" or "mommy," but that she did not encourage this. Grandmother testified to an incident with Mother showing up at the Children's field day in 2018. The rule was that parents were not to interact with children at the event, but Mother went up to the Children anyway. Grandmother then verbally confronted Mother. Grandmother explained why she froze Mother's visitation with the Children:

Q. Okay. Explain to the Court why that was the straw that broke the camel's back and what you said to the mother about, "We can't do this visitation like this anymore."
A. Ava struggles a lot with her emotion, and the no consistency. If I had known in January that [Mother] pled guilty to a cocaine charge, we would have filed for termination then.
Q. And when did you find out that?
A. When she filed for unsupervised contact, that's when I found out.
Q. After you had the conversation with her that you cancelled visits. We're going to have to get this taken care of.

-3-

A. Uh-huh. (Yes.)

\*\*\*

Q. Okay.  But that's when you found out she went back to jail in January 2018?
A. Now I knew that she was arrested.  I knew that she served the ten days. When she got out, she sent me a couple of text messages, and then I was at work one day, and while I was driving or something, I called her whenever I got -- I can't remember.  Anyway, I got on the phone with her, and she said that when she went in front of the judge, the charges was dismissed against her, but not her drugs.  She did ten days, went in front of the judge, had the hearing and everything was dismissed.  She hadn't been in trouble in a year, and I was trying to give her the benefit of the doubt, and I believed her.   I was hoping -- and everything was going halfway decent, and then I get that, and I was like, you know, "Maybe I need to just look at that."
Q. Okay.
A. So whenever I got my papers, I walked over to the clerk's office, and I pulled it, and that's when I seen that she pled guilty to cocaine.

\*\*\*

Q. So you discontinued the visitations.  Correct?
A. Yes.
Q. The mother has always known that the children were in therapy. Correct?
A. I had told her and my son told her that they were seeing a therapist; that the two girls was.
Q. Okay.  Has she ever asked to go to therapy with the children?
A. No.  She's never asked about a doctor's visit.  She's never asked who they go to.  She's never asked nothing about their medical.  The only time anything was asked is if I told her we couldn't make a visit because Camille I think had the flu one time, and then I think [Michael W., III] ended up with it.  I had a cold with it, and then she asked, you know, "Well, how's the -- I'm sorry everybody is sick.  You know, I didn't know that everybody is sick," you know, things like that.

Grandmother was asked about the Children's living arrangements and their progress.  Grandmother stated that the Children have their own separate beds and personal space.  Grandmother testified that she was willing and able to take care of the

Children. Grandmother stated that since Mother's visitations ceased, Ava "went from almost failing in math and having RTI reading and math in second grade and the A-B honor roll in third grade." Regarding Camille, who sometimes stiffened her body when upset, Grandmother stated: "She's -- every once in a while she'll tighten her body up, but she's doing it when she's sitting down and when she gets mad at us, when we make her clean, but other than that, she's doing okay. We still have some issues with her wanting to steal, but there's been some issues ongoing for several years." Both Ava and Camille had discontinued therapy. When Grandparents are working, Grandmother's niece or a good friend, Patricia B., takes care of the Children.

On cross-examination, Grandmother testified that after she discontinued Mother's visitations with the Children in May 2018, Mother texted her a few times asking for visits. Grandmother did not respond to the texts. Grandmother testified:

Q. Okay. And you've never seen anything inappropriate during a visit, but you testified about problems that Camille and Ava specifically -- you've not mentioned [Michael W., III] So I'm assuming he hasn't had any problems.
A. No.
Q. Okay. Problems that Camille and Ava have had.
A. Yes.
Q. I believe you said Camille even to this day continues occasionally with the, I think you called it the dead-man drop.
A. She doesn't do the dead-man drop anymore. Thank goodness. She'll just be sitting there, and she'll get mad and like stiff up, and then she'll be like (makes noise). She doesn't do the screaming, but she still stiffens her body some or growl when she gets mad.
Q. And all these problems you relate back to their mother?
A. No. But after a visit, that's when they would get worse. Is after every visit they would get worse.
Q. You've testified that their mother would -- specifically you said at the May 5th visit she brought pizza. You've also testified that she bought tennis shoes, presents for the kids during visits. Were visits often at the mall?
A. Yes.
Q. Okay. Would she like. . .
A. It was either at the mall or at [the park]. Sometimes at TCBY Yogurt.
Q. Would she buy things for them at the mall?
A. If it was, it was usually at Claire's. She bought Camille a baby doll at Kohl's.

Q. And you specifically told her you didn't want anything from her because you wanted her to get her life together?
A. That's what we told her at the beginning, and then after that, she just never asked.
Q. But she gave things to the kids when she saw them?
A. Sometimes. Not every time. And it was minimal.
Q. Did you receive on behalf of Camille her birthday card that her mother sent her in July 2018?
A. Yeah.
Q. The birthday card had money in it?
A. Yes. It's Camille's birthday money.

Grandfather testified, also. Asked how the Children acted after visits with Mother, Grandfather testified:

Like my wife said, I would hear the girls arguing and being very -- Camille would be very disruptive, very almost angry acting. And Ava would be sad because she's a more emotional child. And I heard what my wife was talking about with them saying, "We don't want to go live nowhere else. This is home." I heard it myself.

Patricia B., a friend of Grandparents, testified as well. Patricia B. is a foster parent. Patricia B. stated that the Children referred to Grandparents as "Mimi and Papaw." Patricia B. testified that she had no concerns about the Children being in Grandparents' care.

William M. testified. William M. had worked with Grandfather at an electric company for a number of years, and they remained friends. William M. testified that Grandfather treated the Children as though they were his own, and that they all got along well.

Continuing our review of the pertinent testimony from trial, Mother took the stand. Mother stated that she had her own apartment since September 2018. Before then, Mother lived with her father when she was released from jail in 2017. Mother testified that she had not been to jail since January 2018. Mother stated that she was on probation, but that she kept up with her probation officer and that there were no problems. Mother testified regarding her visits with the Children:

Q. Since you went to jail for this long stretch between December 2016 and January 2017 -- I'm sorry. December 26, 2015 and January 2017 -- you were in jail for a year, weren't you?

-6-

A. Yeah.

Q. Okay. Well, how have your visits been since then, since you were released in January of 2017?

A. Off and on. I would text her. I'd get a reply. Sometimes I don't.

Q. When you say "off and on," how often did you visit?

A. I visited probably once a month and sometimes would skip a month because due to her busy schedule.

Q. Were you always asking for visits during that time?

A. Absolutely. I've never stopped.

Q. Okay. Tell the Court -- describe what a normal visit was with the kids during this time.

A. It depends on what -- where we was at. If we was at the mall, the kids would want to go to Kohl's and pick out something, which I don't care. I didn't see them much. So whatever I had in my pocket I would spend on them. It didn't matter how much it was. That's just how I am. That's how it was. And when we would go to the park, I'd usually bring toys because I mean what's not -- what kind of visitation is it if you're not going to have fun at the park? So I'd bring drinks and food, toys so we can play. I mean I just did whatever me and my kids would do on a normal basis was playing outside.

Regarding the field day incident, Mother stated that she asked the principal for permission to approach the Children. Mother then went over to see them. Mother testified "when I went over there, [Grandmother] stormed down from the bleachers screaming and yelling and told me I couldn't be right there . . . ." Mother stated that she completed an outpatient program for drug rehab in 2015, and a copy of her certificate of completion was entered into evidence. When asked if she favored one child over another, Mother testified that she loved each of the Children equally.

Mother stated that she recently got a driver's license for the first time, at age 26. As to her troubled past, Mother testified: "I've made a lot of mistakes. I'm not proud of them, but, you know, who I was then is not who I am today, and I'm very proud of the person I became today." Asked why she filed a petition for unsupervised visitation, Mother stated: "Because I was tired of [Grandmother] not giving me my visits that I was supposed to have. I was fed up with me being denied, and I wanted more."

On cross-examination, Mother stated that she had not undergone any further drug treatment since she went back to jail in January 2018. Mother testified: "I feel like jail was enough for me to recuperate and regain and push the start button all over again." Regarding child support, Mother testified:

Q. So since the children were taken out of your custody, you understand -- you understood that obligation?

A. Yes.

Q. So can you tell me, please, between March 20th, 2018 and July 20th, 2018 how much child support did you pay to my clients?

A. I don't even know how to even give them money. I don't never talk to them.

Q. So the answer is none?

A. No, Ma'am.

Q. Well, you said you had a visitation during that time. Did you ever offer my clients any money for keeping the children during that time?

A. No. I just got released from jail. So I didn't have any money. I didn't even have a job at that point in time.

Q. Well now, you said you just got released from jail, but you filed your petition in June 2018. Correct?

A. Yes. I had a job by then.

Q. And in that petition you gloated and bragged that you had a job for a year.

A. I did, and then that's when I would visit with the kids, and that's when they would get whatever they wanted from me at the time when they seen me.

Q. So you agree you had a job?

A. Yes.

Q. You agree you were making money?

A. Yeah.

Q. You were living with your father at that time. Correct?

A. Uh-huh. (Yes.)

Q. You weren't paying any bills at that time that you listed in your discovery. Correct?

A. I was still paying fines and stuff like that.

Q. Fines but no household bills?

A. No, not unless, you know, my dad asked for some money on whatever he wanted.

Q. So you had money. Correct?

A. I worked. So I had money.

Q. But yet, during that four-month time frame, you did not pay any support for the children. Correct?

A. During that time period I was also told that I should be focused on saving up for a house so I can get my children. That's exactly what I was doing.

Q. Okay. Who told you that?

-8-

A. That was words by [Grandmother].

***

Q. I thought you said in your petition in June that you had a job for the year before.

A. I lost that job when I went to jail.

Q. So did you lie in the petition, or are you lying here today?

A. Honey, I'm not lying either way. When I went to jail, up until I went to jail January 2018, I lost my job that I had that whole year. So when I got out of jail, I was not working. I was looking for work, and then when I visited with the kids, I was still looking for work. That's where the. . .

Q. Okay. Let me give you a copy of your petition, and does it not say, "I've worked consistently for over a year"?

A. Yes. It does say that. So. . .

Q. So from June 2017 to June 2018 tell me every place you worked.

A. I'm sorry. When?

Q. From June 2017 to June 2018 tell me every place you worked.

A. I worked at Zaxby's when I first came home, and then I got a job at the Chicken House, and I was juggling both jobs, and then after I lost that job, I went straight to Iconics.

Q. And you lost that job in January for going to jail?

A. Yeah. Cook's Foods.

Q. Okay. And then you went to Iconics when?

A. I think in May, I think.

Q. In May?

A. Yeah.

Q. Okay. So between January and May you didn't have a job?

A. No. I was looking for work.

Q. All right. So the petition is incorrect that you swore to. You had not had a job consistently for a year. Correct?

A. No.

Q. Okay. And so between -- you got the job in May 2018 at Iconics?

A. Yes.

Q. You were living with your father. . .

A. Uh-huh. (Yes.)

Q. . . .and you did not pay any household expenses. Correct?

A. Unless he asked.

Q. How long did you have the job at Iconics?

A. Like eight months.

Q. Eight months?

A. I think. Yeah. Because they wasn't going to try to hire me on. So I went back to Express, and then they sent me to somewhere that really wasn't that great. I can't remember the name of the place. And then I went back to my former job at Buddy's Barbecue, and that's where it's been.

Mother was asked about her male friend, John S. John S. had spent ten years in prison on gun charges and has tattoos of the Aryan Nation. Mother stated that John S. has been a good influence in her life, notwithstanding the fact that he had been involved in the Aryan Nation and she is black.

As for her current bills, Mother stated that her rent is $635 per month, her "lights" are around $160 per month, her car payment is $250 per month, and her insurance is $160 per month. Mother's phone bill is around $100 per month. Mother works at Buddy's Barbecue and earns upwards of $300 per week. Mother works other odd jobs, as well. Mother testified that, with help from a government program, she was about to start school to take CNA classes.

On examination by the guardian ad litem, Mother was asked why she could not abide by the rules of drug court. Mother stated: "[I]t was the fact I had to go to meetings like every day for an hour when I had to go to work and do all the Drug Court stuff that she wanted us to do. I mean it was -- some of the stuff was just un -- it's doable, but it just wasn't for me at the time." Nevertheless, Mother testified she had not done drugs in a long time.

On redirect, Mother testified that John S. never used any racial language toward her. Regarding John S.'s influence in her life, Mother stated:

I've never had such a positive person in my life. You know, I've only known their father, and that was a wreck. I mean every bad thing that's happened in my life, he was right there with it. But every good thing that's going on is new, positive people in my life. That's just what it is. I can't say specifically what he's helped me because I did everything on my own, but he's just a friend cheering me on on the way.

Jocelyn M., Mother's older sister, testified. Jocelyn M. testified that once when she was visiting the Children with Mother circa 2014, Ava became very upset with Grandmother for making her call Grandmother's niece "mother."

The last witness to testify was Grandmother in rebuttal. Grandmother testified that her niece was not living with her in 2014, and that the Children did not call her niece "mommy" at that time anyway. Grandmother testified further that the Children had never

argued with her about not wanting to leave visitation with Mother. Finally, Grandmother testified that she never told Mother she did not want any child support from her.

In August 2019, the Trial Court entered its final order terminating Mother's parental rights to the Children. Of the six grounds alleged against Mother, the Trial Court found that two had been proven by clear and convincing evidence: failure to support and failure to manifest an ability and willingness to assume custody. The Trial Court applied two different four-month periods when ruling on the grounds of failure to support and failure to visit: four months preceding the original petition, and four months preceding the amended petition. On failure to support, the Trial Court found, in part: "Mother knew what support was, and she was willing, capable and able to pay support, and had the discretionary income to pay towards support." Regarding failure to manifest an ability and willingness to assume custody, the Trial Court found, in part, that "Mother's current income does not meet her current needs, based upon her own testimony, and picking up temporary side jobs is not stable enough to demonstrate an ability to financially be responsible for the children" and that "[i]t is the psychological welfare of the children that is the Court's biggest concern, as they have been out of the Mother's custody for over five (5) years, and the youngest child was one (1) year old when he was removed from the custody of the Mother." The Trial Court found that termination of Mother's parental rights is in the Children's best interest.

The Trial Court attached its oral ruling expounding on its rationale to its termination order.[3] In its detailed oral ruling, the Trial Court found, as relevant:

> Okay. Probably the next easiest one -- it usually is -- is failure to support, and that just applies. It may be somewhat questionable on the early period based upon the testimony regarding just save your money and try to get your place and straighten your life out. I guess there's a dispute or a misunderstanding about how long that applied because from [Grandparents], [Grandmother's] testimony that was something that was communicated early on and never countermanded, I suppose, and from [Mother's] position that was always in effect, I suppose, at least until the Petition was filed. After a petition is filed, the legend that you failed to support, and, you know, failure to support is a termination ground because

---

[3] We recognize *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *3 (Tenn. Ct. App. Nov. 25, 2003), *no appl. perm. appeal filed*, wherein this Court stated: "Because of Tenn. Code Ann. § 36-1-113(k), trial courts cannot follow the customary practice of making oral findings from the bench and later adopting them by reference in their final order." (Footnote omitted). We disagree with *Muir* and instead believe that a transcript of sufficiently detailed oral findings incorporated into the court's order can satisfy Tenn. Code Ann. § 36-1-113(k)'s requirements. The oral findings here are sufficiently detailed to enable appellate review.

-11-

the Court, the Juvenile Court of Hamblen County and somebody there actually read the document to you, advised you in their Order that you signed that it was a ground for termination and then you didn't do anything with regard to support even after the first petition was filed, clearly you haven't supported by your own testimony. You had the ability to support the kids, and buying gifts and bringing them pizza to a visitation is not support. I mean you know what support is. We all know what support is. So I find that that statutory ground of failure to support has been established by clear and convincing evidence in this case, particularly with regard to the amended petition four-month period preceding that of January 8th, 2019 to May 8th, 2019.

The other, one of the other allegations of abandonment, failure to visit, there's no question that there was a lack of visits during the four-month period preceding the amended petition, but I don't find that to have been willful based upon the issue that arose following the field day visit and the mother's petition for unsupervised visitation and then [Grandparents'] Petition to Terminate. There's not any question that [Grandmother] wasn't going to subject the children to any additional attempts to visit at that point. So I don't think that [Mother] could have intentionally failed to visit during that four-month period.

Prior to the initial petition in March 20, 2018 through July 20, 2018 there obviously were three times that [Mother] had contact with her children at the mall, at the park and at field day. It gets tricky figuring out about the time frames just because of the number of times that [Mother] has been incarcerated for a period anyway. So during the four-month period preceding the initial petition it looks like there was only ten days during which [Mother] was incarcerated, and that was January 21 through January 31, 2018, and that was for that last drug arrest that occurred in January of 2018. Yeah.

Based upon the testimony regarding those three visits between mom and the children, even though the direct interaction may have been somewhat minimal between mom and the kids, I don't find that clear and convincing evidence establishes that they were token visitation or less. I think they were legitimate visits, and that, therefore, failure to visit has not been proven by clear and convincing evidence for the four-month preceding the filing of the original petition. I mean the children are fairly young. It's not like they're going to sit down and have a deep discussion at any point in time. As [Mother] said, she wants the kids to have fun when she visits, and having fun generally means playing for the kids and they're at venues where playing is facilitated obviously, a park and at the mall where there's

-12-

a play area in the middle of the mall. So I don't think they were token, and I think that that hasn't been proven.

So failure to visit on both the petition and the amended petition the Court finds has not been established.

***

Failure to manifest an ability and willingness to personally assume legal and physical custody and financial responsibility pursuant to TCA 36-1-11(g)(14) alleged as Ground 6 of the petition and styled as the "Failure to petition to have return of custody or for visitation" ground. The Court finds that this particular ground has been proven by clear and convincing evidence in that there's just not any question that nothing really changed until shortly before the first petition was filed or, depending on how you want to view the facts after the first petition was filed, viewing them in the light most favorable to [Mother]. Things began to change after her release from incarceration in January of 2018, and then certainly after the filing of the Petition to Terminate in 2018, she started the real process of the harder work of getting everything straightened up, cleaned up in her life to make it possible. You know, there were five years down the road almost from removal, and, you know, that was when [Mother] made her petition to just move to unsupervised visits. And so there really hasn't been a manifestation of an ability and willingness to personally assume legal and physical custody or financial responsibility of these children. Her current income does not meet her current needs it does not appear. Picking up temporary side jobs to make up the difference is not a stable enough income to count to demonstrate ability to be financially responsible for three additional persons in your household. The fact that you've never paid any support for the kids also supports that conclusion. The apartment was not obtained until September of -- mid-September of 2018, two months after the initial Petition to Terminate had been filed, and by her own admission [Mother] was only starting to change her life in 2018 after that incarceration at the beginning of that year.

The other part of that particular section of the code is that placing the children back into her legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children. And it's the psychological welfare or the mental well-being of the children that would be my biggest concern on that. I mean it's just hard for anybody to say that you've got some -- this guy who's got these prison tattoos that did two years in the penitentiary, that's your boyfriend now. That's a -- I mean that's a concern to anybody. We don't know him. I mean you're

right about that, but it's like one of those things sort of like on paper or on just tell me the facts. Those facts don't sound good. They cause concern about the well-being of your children. So, you know, still the biggest concern is just that either way, you get your children back or you don't get your children back but you fall back off of this wagon that you're on right now and that you resort to drug use. I mean that's just the biggest concern, just to be frank, that anybody is going to have in this scenario. But certainly that particular boyfriend doesn't add -- and, you know, we didn't meet him. We don't know what he's like. Right? So all we've got is this, his little resume of bad that's following him around, and hopefully he's made a change.

This whole idea about that -- I mean I think he's disproven the racist issue -- right? -- just by being with you, but it doesn't eliminate the concern that some other Aryan Nation person might show up to do him harm or you because he's with you and pose a risk to your kids. I don't know how you ever overcome that concern. I don't know. Maybe all the people that he was in the Aryan Nation with in prison are in [another state]. You know, maybe he -- I don't know. But I'm just telling you that it's a concern. I'm not saying that there's proof of clear and convincing evidence level that your kids are subject to a risk of substantial physical harm. I can't find that. I'm just telling you these concerns are there.

The psychological issue is that we are five years down the road since the kids started living full time with the paternal grandparents, and especially with regard to [Michael W., III], that's their world. You know, five years to a five-year old is his whole life. Five years to a nine-year old is more than half of her life, and, you know, it doesn't seem that long to you. It doesn't seem that long to me, but it's such an impact on the children, and the younger, the more the impact that uprooting them now. I think it poses a substantial risk to their mental health or their psychological welfare as the statute words it. So I find that that particular ground applies.

So I think I covered all the grounds, and I found two statutory grounds to be applicable, the support ground and then this failure to manifest the ability and willingness to assume legal, physical and financial responsibility ground. And that's just the first step.

And the second step is to look at what's in the best interest of the children. For that we have to look over further in the statute at 36-1-113(i). There are 1 through 9 factors listed there that the Court's required to consider. So I'm going to go through each one of them to make it clear that I have considered them.

Number 1 is whether the parent has made an adjustment of conduct, circumstance or conditions to make it safe and in the child's best interest to

-14-

be in, I'll just say her home. I hope that she has. I think the year and a couple of months that have passed since she was last arrested indicate that she is on that road. So I find that the first factor slightly favorable to mother.

Two, whether the parent has failed to affect a lasting adjustment after reasonable efforts by available social service agencies or for such duration of time that lasting adjustment does not reasonably appear possible. We don't know if the adjustment is lasting because it's just been for the last year and a couple of months, but it looks like she's made an adjustment, and a year and a couple of months have gone by without any indication to the contrary. So at least it doesn't appear impossible that she's made a lasting adjustment.

Number 3, whether the parent has maintained regular visitation or other contact with the child. You know, truthfully, once a month or once every two months just is not regular visitation. It's just not. So I find that you've not maintained regular visitation even when it was possible, but I know that from your standpoint that's not necessarily always been your call because of [Grandmother's] schedule, but it's on you as a parent to make sure that you maintain regular visitation with your child.

Number 4, whether a meaningful relationship has otherwise been established. I find that there is a meaningful relationship between the two girls and the mom for sure. I do not find for sure that there is a meaningful relationship between mom and [Michael W., III].

Number 5, the effect of change of caretakers and physical environment is likely to have on the children's emotional, psychological and medical condition. Well, medical doesn't apply. Emotional and psychological I've already addressed that with regard to my findings about the applicability of Ground 6 for termination; that I think it would be detrimental to the children to have a change of caretakers and physical environment. And more on that line, just physical environment, even before [Grandparents] took over the parenting responsibilities, the physical environment of their home has, for the most part, been the physical environment of the kids and is a credit that testimony regarding the children saying, "This is our home," and/or "This is the only home I've ever had." That's what that physical environment is. Stability is very important in a child's life, and having spent most of their lives in that physical environment and at least the last five with their paternal grandparents serving as their parents has been the only stability that they've really had.

Number 6, whether the parent or other person residing with the parent has shown brutality, physical, sexual, emotional or psychological

abuse or neglect toward the child or an adult or somebody else does not apply.

Number 7, whether the physical environment of the parents' home was healthy and safe, whether there's criminal activity in the home or whether there is use of alcohol, controlled substance or controlled substance analogs as may render the parent consistently unable to care for the child does not appear to apply anymore.

Number 8, whether the parents' mental and emotional status would be detrimental to the child or prevent the parent from effectively providing a safe and stable care and supervision for the child. I find that that does not apply.

Number 9, whether the parent has paid child support consistent with the child support guidelines promulgated by the Department, and obviously there hadn't been any child support paid. So that one favors a finding that it's in the children's best interest.

\*\*\*

[Y]our case is unlike most of the cases that I preside over that involve drugs and criminal entanglement from the standpoint that typically those moms and dads never get clean truthfully. Most of them don't, and I think you are, and I hope you stay that way, but the children could not wait for that to happen and shouldn't have to wait for that to happen. What's best for them, not for you -- I'm saying that, you know. I hate that -- is that your parental rights be terminated so that they can be adopted and have that stability that these children desperately need. I hope the best for you and for these children.

Mother timely appealed to this Court.

## Discussion

Although not stated exactly as such, Mother raises the following three issues on appeal: 1) whether the Trial Court erred in finding the ground of failure to support; 2) whether the Trial Court erred in finding the ground of failure to manifest an ability and willingness to assume custody; and, 3) whether the Trial Court erred in finding that termination of Mother's parental rights is in the Children's best interest. Grandparents raise a separate issue of whether the Trial Court erred in declining to find the ground of failure to visit.

-16-

As our Supreme Court has instructed regarding the standard of review in parental termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[4] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id*. at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640

---

[4] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

(1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id*.; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[5] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests

---

[5] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

analysis are statutorily enumerated,[6] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on

---

[6] Tenn. Code Ann. § 36-1-113(i).

the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Three grounds for termination are at issue on this appeal, set out by statute as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

\*\*\*

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; . . .

-20-

Tenn. Code Ann. § 36-1-113(g) (Supp. 2019).

As relevant, "abandonment" means:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child; . . .

***

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;

***

(D) For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's ["]support" means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period;

***

(F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child;

***

(H) Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children; and

(I) For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure;

Tenn. Code Ann. § 36-1-102 (Supp. 2019).[7]

We first address whether the Trial Court erred in finding the ground of failure to support. Mother argues, first, that the Trial Court erred by looking at two different four-month periods, one preceding the filing of the original petition on July 20, 2018, and one preceding the filing of the amended petition on May 8, 2019. Mother argues that "[t]he amended petition alleges no separate and distinct facts and raise no new grounds. Pursuant to Tennessee Rule of Civil Procedure 15.03 the amendment relates back to the date of the original petition, and the relevant four-months remains the same." This Court has discussed the appropriate four-month period to apply when an amended petition to terminate parental rights is filed:

> [W]e conclude that the amended petition in this case was not a "separate and distinct" petition from the original petition, as the facts alleged in the initial petition and the amended petition were largely identical. Consequently, the amended petition will relate back to the filing date of the initial petition. *See also In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) ("Although the petition was later amended in September 2005, the relevant period for purposes of abandonment is the four-month period immediately preceding the filing of the original petition."); *In re Chase L.*, No. M2017-02362-COA-R3-PT, 2018 WL 3203109, at *9 (Tenn. Ct. App. June 29, 2018) (citing *In re J.G.H.*, 2009 WL 2502003, at *13) ("[T]his Court has previously held that where an 'amendment' to a termination petition did not constitute a separate and distinct petition, the proper four month period to consider was the four months preceding the filing of the original petition, not the amendment."). In evaluating Mother's alleged willful failure to visit and support, we therefore consider the four month period preceding the filing of the initial petition. *See* Tenn. Code Ann. 36-1-102(1)(A)(i) (stating that abandonment occurs when a

---

[7] For petitions filed on or after July 1, 2018, it is a parent's burden to show that his or her failure to visit or support was not willful. The original petition in this matter was filed on July 20, 2018. Therefore, we apply the amended version of the statute. Both parties agree and argue thusly, albeit to different conclusions.

parent willfully fails to visit or support in the four months preceding the filing of the termination petition).

*In re P.G.*, No. M2017-02291-COA-R3-PT, 2018 WL 3954327, at \*7 (Tenn. Ct. App. Aug. 17, 2018), *no appl. perm. appeal filed*.

The question, then, is whether Grandparents' amended petition was a "separate and distinct petition." The amended petition, as pertinent, is basically identical to the original petition except with some paragraphs in bold adding some factual allegations from the time the original petition was filed. No new grounds were alleged. For failure to support, the amended petition added, in relevant part:

> [F]or the four for [sic] month period prior to filling this Amended Petition, the Mother has taken no action to support the children. She admits in her discovery answers that she has been employed within this time frame, and her regular monthly bills are nominal. She had the means to support, she had knowledge of her duty to support, and has failed to support.

Grandparents already had alleged in the original petition that Mother failed to support the Children. In the amended petition, Grandparents alleged that Mother continued to fail to support the Children. We do not regard the latter as separate or distinct. Rather, it is a continuation of the allegations made pertaining to the same grounds alleged in the original petition. The amended petition is similarly redundant as regards the ground of failure to visit: "[T]he Mother admitted in discovery that the Petitioner, [Grandmother], regularly replies to her text. For the Four months preceding the filing of this Amended Petition, the Mother has not visited with the children at all, and has made no effort to see the children." Again, Grandparents already had alleged failure to visit. Grandparents' interpretation would mean that parties seeking to terminate parental rights could file an amended petition or a succession of amended petitions, presumably with the hope that in at least one four-month period, an abandonment ground could be proven. We do not believe the statute provides for this result, nor are we aware of any cases interpreting the determinative period this way. There is but one determinative four-month period envisioned by Tenn. Code Ann. § 36-1-102(1)(A)(i).

The amended petition alleged no new grounds; it merely added on to already alleged grounds for abandonment. Just as Mother could not cure her failure to support or visit by resuming visitation or support after the filing of the petition, neither can Grandparents rely on multiple determinative periods for the same grounds. Nothing about the language of the statute as amended in 2018 changes the existing law on the subject, even though it refers to "four (4) consecutive months immediately preceding the filing of a . . . petition, or *any amended petition*. . . ." Tenn. Code Ann. § 36-1-

102(1)(A)(i) (Supp. 2019) (emphasis added). An amended petition *could* serve as a triggering date for a determinative four-month period, provided it were separate and distinct. The amended petition here is not.

Thus, the sole determinative period was the four months preceding the filing of the original petition, and the Trial Court erred in applying two different four-month periods. However, "a miscalculation of the relevant four-month period can be considered harmless when the trial court made sufficient findings of fact that encompassed the correct determinative period." *In re J'Khari F.*, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *9 (Tenn. Ct. App. Jan. 31, 2019), *no appl. perm. appeal filed*. The Trial Court made sufficient findings of fact for the correct period as well as the wrong one. Therefore, we regard the Trial Court's error as harmless, and proceed with reviewing the ground of failure to support.

Mother concedes that she never paid Grandparents any child support. Mother argues, however, that Grandmother told her she did not have to pay any child support. Grandmother testified at trial that she never told Mother not to pay child support. The Trial Court implicitly credited Grandmother's testimony. In addition, a parent's duty to pay child support is not automatically excused by another person's conduct. As this Court has stated, "[f]ailure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (citations and footnote omitted). The Trial Court found no such interference here relative to child support. Furthermore, "[t]he parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially." *Id*. (citations omitted).

Mother points also to items she bought the Children on visits, and a birthday card containing an unspecified amount of money she gave to Camille in 2018. While nice enough gestures, these sporadic gifts were token in nature. These gifts, unilateral and ad hoc as they were, were not a substitute for monetary payments for the day-to-day necessities of the Children, which is the essence of child support.

As a final matter on this issue, Mother cites one of the Trial Court's findings as supporting her position on failure to support. In ruling on the ground of failure to manifest an ability and willingness to assume custody, the Trial Court stated: "[Mother's] current income does not meet her current needs it does not appear. Picking up temporary side jobs to make up the difference is not a stable enough income to count to demonstrate ability to be financially responsible for three additional persons in your household."

-24-

Mother's position is erroneous for at least two reasons. First, this finding went to a separate ground with separate elements. A parent's job instability being such that the parent is unable to personally assume legal and physical custody or financial responsibility for her children does not necessarily mean that the parent was unable to pay any child support during the relevant determinative period. Second, Mother made no child support payments in any four-month period. Under the applicable statute in effect, the burden was on Mother to prove, by a preponderance of the evidence, that her failure to pay child support was not willful. Mother has not met that burden. The evidence reflects, instead, that Mother just failed to pay any child support. Her explanations why clearly were not credited by the Trial Court. The evidence does not preponderate against any of the Trial Court's findings relevant to this ground. We find, as did the Trial Court, that the ground of failure to support was proven by clear and convincing evidence.

We next address whether the Trial Court erred in finding the ground of failure to manifest an ability and willingness to assume custody. One panel of this Court has held that, under the first prong of this ground, the parent must be able *and* willing to assume legal and physical custody or financial responsibility of a child, not just one of the two. *See In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at \*12-14 (Tenn. Ct. App. June 20, 2018), *no appl. perm. appeal filed.*[8] Mother argues that her willingness to parent was demonstrated by her filing a petition seeking unsupervised visitation in May 2018. Mother argues next that the recent positive changes to her life, such as getting her own apartment, a reliable car, and her driver's license reflect that she is now able to personally take custody of the Children.

With respect to willingness, Mother's petition for unsupervised visitation filed two months before the filing of the petition seeking to terminate her parental rights does not equate to an expression of willingness to personally assume custody of the Children. There is, after all, a material difference between unsupervised visitation and personally assuming the responsibilities that accompany custody. The Trial Court noted that Mother has never made a child support payment, notwithstanding her improvements and despite the passage of much time. Unfortunately, this speaks louder about Mother's willingness to personally assume custody of the Children than Mother's mere words. When she has had the opportunity in between stints in jail, Mother simply has not parented the Children in any substantial way. The evidence does not preponderate against any of the Trial Court's findings relevant to this ground. We find by clear and convincing evidence, as did the Trial Court, that Mother has failed to manifest—largely by omission—a willingness to personally assume legal and physical custody or financial responsibility of the Children.

---

[8] We are aware that there is a split in authority as to this interpretation. In this case, however, we find, as did the Trial Court, that Mother manifested neither the ability nor willingness to assume custody, so the split in authority is moot here.

Under the *In re Amynn K.* interpretation, we would proceed to the next prong of the ground as we found Mother failed to manifest willingness, but, for completeness, we will address whether Mother likewise has failed to manifest an ability to assume custody. Mother is correct in that the evidence at trial reflects that she has made a number of key improvements in her life, such as getting a residence, a car, and driver's license, and perhaps most importantly, staying off illicit drugs. We do not downplay Mother's personal improvements, and we hope that she will continue with them. However, her improvements have come very late in the case. Mother was in jail as late as January 2018. The petition was filed in July 2018, and the Children have been in Grandparents' custody since March 2014. Mother has taken the first steps to living life drug-free and leaving behind her frequent trips to jail. She is working, but as found by the Trial Court, she relies on a variety of temporary jobs. That is a good start, but it does not amount to manifesting an ability to parent the Children. We find by clear and convincing evidence, as did the Trial Court, that Mother has failed to manifest an ability to assume physical and legal custody or financial responsibility of the Children.

The second prong of this ground requires us to determine whether "placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14) (Supp. 2019). This Court discussed the substantial harm standard in *Ray v. Ray*, stating:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (discussing the substantial harm standard as applicable to a custody dispute) (footnotes omitted). The Trial Court found, among other things, as to this prong that uprooting the Children from their longtime home would risk substantial harm to their psychological welfare. The testimony at trial bolsters this finding. The Children now have been in Grandparents' custody for around six years. Grandparents' home is the only home they know. Their deep attachment to their home environment was evident from the testimony. Uprooting the Children now likely would have a profoundly negative impact on their psychological welfare. We find by clear and convincing evidence, as did the Trial Court, that placing the Children in

Mother's custody would pose a substantial risk of harm to their psychological welfare. We affirm this ground.

We next address Grandparents' issue of whether the Trial Court erred in declining to find the ground of failure to visit. Our analysis as to the determinative four-month period is the same as with the ground of failure support, for the same reasons discussed earlier. The determinative period therefore is March 20, 2018 to July 19, 2018.[9] Grandparents point out that Mother visited only three times in the determinative period, and that the visits were not very meaningful. Grandparents may be correct in that the visits were of dubious quality, but we find, as did the Trial Court, they were not so meaningless as to be token. Moreover, Grandmother stopped Mother from visiting the Children from May 2018 onward. Mother hardly can be faulted for failing to visit after that. Mother proceeded to file a petition seeking unsupervised visitation, and this litigation ensued shortly thereafter. We agree with the Trial Court that the ground of failure to visit was not proven by clear and convincing evidence. However, as we have affirmed at least one ground already, we next consider the Children's best interest.

The final issue we address is whether the Trial Court erred in finding that termination of Mother's parental rights is in the Children's best interest. When considering best interest in parental rights termination cases, courts consider the following factors:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

---

[9] The Trial Court appears to have wrongly counted in the determinative period July 20, 2018, the day the original petition was filed. The day before the petition is filed is the last day of the determinative four-month period, so the last day here is July 19, 2018. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014), *no appl. perm. appeal filed*. However, the Trial Court's inclusion of the day of filing has no effect on the outcome here, and, as we discuss, we find the ground not proven anyway.

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2019).

The Trial Court made detailed best interest findings. The Trial Court found that factors (6), (7), and (8) were not applicable. The Trial Court found that factors (1), (2), and (4) tended to support not terminating Mother's parental rights, although as to factor (4), the Trial Court questioned how meaningful Mother's relationship is with Michael W., III, the youngest child. The Trial Court found that factors (3), (5), and (9) supported termination of Mother's parental rights.

The evidence does not preponderate against the Trial Court's findings relative to best interest. These best interest factors are not mathematical. Some factors can be more dispositive than others. Like the Trial Court, we acknowledge the improvements that Mother has made in her life. Mother's improvements have come very late, however, and by trial, the Children had spent five years in Grandparents' custody. To potentially

uproot the Children from what, based on this record, is a stable environment and one to which they are attached and place them with Mother would be an enormous gamble with their well-being, notwithstanding Mother's improvements to this point. We find, by clear and convincing evidence, that termination of Mother's parental rights is in the Children's best interest. We affirm the judgment of the Trial Court.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Janae M., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE